IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

KENDALE JUDGE,

                    Plaintiff,

    v.

C.O. GIBSON,

                   Defendant.

Civil Action No.
9:13-CV-0727 (FJS/DEP)

_____

APPEARANCES:

FOR PLAINTIFF:                                    OF COUNSEL:

KENDALE JUDGE, *Pro Se*
12-A-4883
Bare Hill Correctional Facility
181 Brand Rd.
Caller Box 20
Malone, NY 12953-0020

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN              COLLEEN D. GALLIGAN, ESQ.
New York State Attorney General        Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Kendale Judge, a New York State prison inmate, commenced this action pursuant to 42 U.S.C. § 1983 alleging that defendant William Gibson, a corrections officer, and other corrections personnel, including the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"), violated his civil rights. Plaintiff's claims are based upon an incident in which defendant Gibson is alleged to have verbally and physically assaulted the plaintiff.

Currently pending before the court is a motion by defendant Gibson, the sole remaining defendant in the action following the earlier dismissal of the other four named defendants, seeking the entry of summary judgment dismissing the balance of plaintiff's claims based on plaintiff's failure to exhaust available administrative remedies before filing suit and on the merits. For the reasons set forth below, I recommend that defendant's motion be granted.

I.      BACKGROUND[1]

Plaintiff is a prison inmate currently in the custody of the DOCCS. *See generally*, [Dkt. No. 1](). Plaintiff is confined in the Bare Hill Correctional Facility ("Bare Hill"), located in Malone, New York, where he was incarcerated at the times relevant to his claims in this action. *Id.*

On March 19, 2013, Judge was removed from a class at Bare Hill for being argumentative with the teacher. [Dkt. No. 1 at 4](). The teacher escorted the plaintiff to the officers' desk in the lobby of Bare Hill's school building and described plaintiff's behavior to defendant Gibson, who, at the time, served as the main school officer. [Dkt. No. 22-3 at 2](). As a result of the incident, plaintiff was issued a misbehavior report by the teacher. [Dkt. No. 22-3 at 5]().

At this point, the parties' versions of the relevant events diverge. Plaintiff alleges that defendant Gibson and two other corrections officers escorted Judge to an empty room where he was positioned with his hands against the wall and feet spread apart. [Dkt. No. 1 at 5](). Defendant Gibson then grabbed him by the neck, at which point Judge fell to his hands and knees on a bench. *Id.* Defendant Gibson began making insulting verbal

---

[1]      In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

comments toward plaintiff and slapped him three times on the back of the head. *Id.*

Defendant's version of the relevant events significantly differs from plaintiff's account. According to the defendant, after plaintiff was removed from class, Gibson directed plaintiff to wait in the lobby of the school building until the area supervisor was notified of the situation, at which time the supervisor released Judge without incident back into his housing unit pending a disciplinary hearing. Dkt. No. 22-3 at 2. Defendant Gibson denies having physically assaulted or verbally harassed the plaintiff on March 19, 2013, or at any other time, and denies ever "physically touch[ing] plaintiff at all in any way whatsoever" on that date. *Id.* In light of plaintiff's complaint that he was assaulted by a corrections officer, Judge was examined by medical staff at Bare Hill on March 27, 2013, at which time no bruises or injuries were observed. Dkt. No. 22-3 at 5.

II.    PROCEDURAL HISTORY

Plaintiff's complaint, which is dated May 11, 2013, was filed in the Eastern District of New York on May 17, 2013. Dkt. No. 1. The complaint named five defendants, including Corrections Officer Gibson; DOCCS Commissioner Brian Fischer; Bare Hill Superintendent Bruce S. Yelich; Mrs. Larue, a teacher at Bare Hill; and the State of New York. *Id.* at 3. Plaintiff's

4

complaint was accompanied by an application for leave to proceed *in forma pauperis* ("IFP"). Dkt. No. 3. The matter was subsequently transferred to this district on June 21, 2013, pursuant to 28 U.S.C. §§ 112(a), 1406(a). Dkt. No. 5.

Upon receipt of the matter in this district, plaintiff's complaint and accompanying IFP application were reviewed by Senior District Judge Frederick J. Scullin, Jr., who granted plaintiff's request to proceed IFP and dismissed all of the claims set forth in plaintiff's complaint with the exception of the excessive force claim asserted against defendant Gibson. *See generally* Dkt. No. 13.

On March 13, 2014, following the close of discovery, defendant Gibson moved for the entry of summary judgment dismissing plaintiff's claims against him. Dkt. No. 22. In his motion, defendant contends that (1) plaintiff's complaint is procedurally deficient based upon his failure to exhaust available administrative remedies before commencing suit, and (2) no reasonable factfinder could conclude plaintiff's Eighth Amendment rights were violated by his actions, even as alleged by the plaintiff in his complaint. Dkt. No. 22-6 at 4-10. On April 13, 2014, plaintiff filed a document which the court has liberally construed as his response in opposition to defendant's

motion.[2] [Dkt. No. 24](). In his submission, plaintiff includes (1) a document purporting to be an affidavit from a fellow inmate regarding the alleged assault by defendant Gibson, and (2) a letter recounting the incident, which plaintiff alleges he sent "to Albany." [Dkt. No. 24](). Significantly, plaintiff's opposition does not include a statement in response to defendant's local rule 7.1(a)(3) statement of undisputed material facts.

Defendant's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Plaintiff's Failure to Submit a Responsive Rule 7.1(a)(3) Statement

As was noted above, although plaintiff submitted a brief response to defendant's summary judgment motion, it did not address defendant's statement of undisputed material issues of fact submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court. *See generally* [Dkt. No. 24](). Before turning to the merits of defendant's motion, a threshold issue to

---

[2]    Plaintiff was informed by the court that the deadline for responding to the motion for summary judgment was April 11, 2013. [Dkt. No. 23 at 1](). Plaintiff's response, however, is dated by him as April 13, 2013, rendering it two days late. [Dkt. No. 24](). Mindful of my duty to extend special solicitude to *pro se* litigants, however, I have considered the untimely response in reviewing the motion.

be addressed is the legal significance of this failure.

This court's local rules provide that any motion for summary judgment must be accompanied by a statement of material facts as to which, the moving party submits, there exists no genuine dispute. N.D.N.Y. L.R. 7.1(a)(3). The rule further requires that each fact listed set forth a specific citation to the record where the fact is established. *Id.*

In this instance, defendant's motion was accompanied by a proper rule 7.1(a)(3) statement, including corresponding record citations. Dkt. No. 22-1. The motion also included a notice to plaintiff of the consequences of failing to properly respond to the summary judgment motion, which stated that, "[i]f [plaintiff] do[es] not submit a proper response to the defendants' statement of material facts, **the Court may deem [him] to have admitted the defendants' factual statements**." Dkt. No. 22 at 3 (emphasis in original).

Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Under this rule, plaintiff's failure to respond to the defendant's rule 7.1(a)(3) statement is the functional equivalent of his admission of the material facts contained with the statement for purposes of the instant motion. *See*

*Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn J.) (listing cases); *see also Monahan v. N.Y. City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rule 7.1(a)(3); *Ketchuck v. Boyer*, No. 10-CV-0870, 2011 WL 5080404, at *2 (N.D.N.Y. Oct. 25, 2011) (McAvoy, J.) ("[T]he responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly." (listing cases)).[3]

### B.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

---

[3]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to

the verdict").

C.    Exhaustion of Administrative Remedies

In his motion, defendant Gibson argues that plaintiff's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit. Dkt. No. 22-6 at 4-6. The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*,

534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[4]

The DOCCS makes available to inmates a grievance procedure entitled the Inmate Grievance Program ("IGP"). The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged

---

[4] While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[5] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

As can be seen, at each step of the IGP process, a decision must be

---

[5]    Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(i), (ii).

rendered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can – and must – be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

The record is equivocal as to whether plaintiff filed a formal grievance concerning the events relevant to this action. In his complaint, Judge alleges that he did file a grievance and appealed it to the facility superintendent, Albany, and the DOCCS Inspector General. Dkt. No. 1 at 2. In his deposition, however, plaintiff testified that he did not file a grievance out of fear of retaliation by corrections officers. Dkt. No. 22-2 at 18. In

response to defendant's motion, plaintiff attached a "grievance" he "sent to Albany," which shows two stamps, one indicating receipt by the DOCCS Office of Counsel for the Board of Parole on March 22, 2013, and a second showing receipt by the DOCCS on March 26, 2013. Dkt. No. 24 at 3-4. The latter also states "RECEIVED INMATE GRIEVANCE." *Id.* at 3.

Regardless of whether plaintiff filed a formal grievance through the IGP concerning the alleged assault by defendant Gibson, it is uncontested that any such grievance was not pursued to completion through appeal to the CORC. Defendant's rule 7.1(a)(3) statement, to which plaintiff has not responded, includes the following assertion:

> Plaintiff did not appeal to CORC regarding any grievance filed under NYCRR §§ 701.5 or 701.8 alleging he was subjected to excessive force by Officer Gibson at Bare Hill Correctional Facility on March 19, 2013. *See*, Hale Decl. ¶¶ 11-12.

Dkt. No. 22-1 at 4. To satisfy the PLRA's exhaustion requirement, plaintiff must have completed all steps of the IGP, including seeking review by the CORC. *Ruggerio*, 467 F.3d at 176. In light of plaintiff's failure to respond to this statement, and the fact that it is supported by the record, it therefore stands uncontested, for purposes of the instant motion, that plaintiff did not fully exhaust the available administrative remedies concerning the events giving rise to this action.

Plaintiff's apparent failure to exhaust available remedies is not necessarily fatal to his claims. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted when an inmate has failed to file and pursue to completion a proper grievance concerning the issues raised in the action. *See*, *e.g.*, *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id*. In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id*.

Liberally construing plaintiff's allegations, deposition testimony, and his response in opposition to the pending motion, it appears he contends that he should be excused from his failure to exhaust administrative remedies because he feared retaliation by corrections officers. Dkt. No. 22-2 at 18; Dkt. No. 24 at 1. In addition, in his response to defendant's motion, Judge states "I am still in fear of my safety and life at this time[.]" Plaintiff's purported fear of retaliation lacks plausibility in light of the letter sent by him to the DOCCS on the same day of the alleged assault. Dkt. No. 24 at 3-4. In addition, plaintiff commenced this action less than two months following the incident. Dkt. No. 1. These circumstances bely plaintiff's conclusory and unsupported claim that he feared retribution. Similarly, plaintiff's vague and unsupported allegation, in his response to the defendant's motion, that he is "still in fear for [his] safety" is not sufficient to satisfy any of the exceptions to the exhaustion rule. *See Singh v. Lynch*, 460 F. App'x 45, 47-48 (2d Cir. 2012) ("The test for determining the availability of grievance procedures to a prisoner is objective . . . . Singh's subjective fear of retaliatory physical harm derives from two facts: the unreported June 6, 2005 assault and other inmates' warnings that Lynch was out to get him. The former fact cannot, by itself, support an objective finding that grievance procedures were unavailable . . . . As for the alleged inmate warnings, in the

16

absence of any particulars indicating that Lynch was looking to do more than harass Singh . . ., this fact cannot support a finding that grievance procedures for an assault claim were effectively unavailable."); *Harrison v. Stallone*, No. 06-CV-0902, 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007) (Kahn, J., *adopting report and recommendation by* DiBianco, M.J.) (concluding that the plaintiff was not excused from exhausting available administrative remedies even where the plaintiff alleged in his complaint that he did not file a grievance because he was "'afraid of retaliation'" and he stated in opposition to the defendants' motion for summary judgment that "he had a 'legitimate fear' of retaliation because of his substantive claim is one for retaliation"). To hold otherwise would permit an exception that would be easily and often incanted by inmates, and would potentially undermine the PLRA's exhaustion rule. *Harrison*, 2007 WL 2789473, at *6.

Based upon the foregoing, I recommend a finding that plaintiff's claims in this action are subject to dismissal on the procedural ground that he failed to exhaust available administrative remedies before commencing suit.

D.    Merits of Plaintiff's Excessive Force Claim

Addressing the merits of plaintiff's claims, defendant Gibson argues that his allegations are not sufficient to support a cognizable constitutional claim. Dkt. No. 22-6 at 7-10. Plaintiff's excessive force claim is grounded in

17

the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson*, 503 U.S. at 7-8; *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by

wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quotation marks omitted); *accord*, *Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases – not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort

repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] . . . focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.'" *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force . . . are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503

U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

In this instance, even assuming the truth of plaintiff's allegations regarding the extent of force used against him by defendant Gibson on March 19, 2013, no reasonable factfinder could conclude that his Eighth Amendment rights were abridged by the defendant. Plaintiff contends that, after defendant Gibson instructed him to place his hands against the wall with his feet apart, defendant Gibson kicked his feet further apart and then grabbed his neck, at which point plaintiff fell to his hands and knees onto a bench where defendant Gibson slapped Judge three times on the back of

the head.[6] Dkt. No. 1 at 5. In light of his claim of having been subjected to excessive force, plaintiff was examined by medical personnel at the facility, who observed no visible bruises or injuries. Dkt. No. 22-3 at 5. Significantly, in the medical report, the examiner stated, "[I]nmate denies injuries or medical concerns at this time."[7] *Id.*

The Supreme Court has explained that a *de minimis* use of force constitutes a violation of the Eighth Amendment only if it is "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10. The Second Circuit, moreover, has agreed "with other circuits that some degree of injury is ordinarily required" for a plaintiff to succeed on his Eighth Amendment claim. *U.S. v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999). Plaintiff alleges only that he was grabbed by the back of the neck and "slap[ped]" on the head three times by defendant Gibson. Dkt. No. 1 at 5. In addition, defendants have submitted uncontroverted evidence that, as a result of the alleged use of force by defendant Gibson, plaintiff suffered no injury and reported no

---

[6]     Plaintiff also claims that, during the course of the incident, he was subjected to verbal abuse by the defendant. Dkt. No. 1 at 4-5. It is well-established, however, that claims of verbal abuse or harassment, standing alone, are not cognizable under 42 U.S.C. § 1983. *See, e.g., Jermosen v. Coughlin*, 878 F. Supp. 444, 449 (N.D.N.Y. 1995) (McAvoy, J.) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under [section] 1983." (citing cases)).

[7]     As was previously noted, the lack of a serious injury alone does not necessarily negate a finding of excessive force. *Wright*, 554 F.3d at 268-69.

medical concerns to Bare Hill medical staff. Dkt. No. 22-3 at 5. While the court does not necessarily condone the conduct alleged in plaintiff's complaint, if it in fact occurred as stated, no reasonable factfinder could conclude that the use of force, even as claimed by the plaintiff, was anything more than *de minimis* or was of the type that shocks the conscience. *See Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (concluding that the plaintiff's allegations "of a small number of incidents in which he was allegedly verbally harassed, touched, and pressed against without his consent" were not "severe enough to be objectively, sufficiently serious" (quotation marks omitted)); *McEachin v. Bek*, No. 06-CV-6453, 2012 WL 1113584, at *7 (W.D.N.Y. Apr. 2, 2012) (granting summary judgment in the defendant's favor where the court assumed, for purposes of the motion, that the defendant struck the plaintiff in the head three times with his closed fist); *Romaine v. Rawson*, 140 F. Supp. 2d 204, 212 (N.D.N.Y. 2001) (Kahn, J.) ("Regardless[] of whether the strikes were open-fisted or closed-fisted, given the lack of any visible injury to Plaintiff, the Court concludes that Defendant's application of force against Plaintiff was de minimis."); *Santiago v. C.O. Campisi Shield No. 4592*, 91 F. Supp. 2d 665, 674 (S.D.N.Y. 2000) (dismissing the plaintiff's excessive force claim where the most severe use of force was "an open-handed slap"). Accordingly, I further

recommend plaintiff's excessive force claim asserted against defendant Gibson be dismissed on the merits.

IV.  SUMMARY AND RECOMMENDATION

As an initial procedural matter, plaintiff's failure to file a grievance concerning the matters now complained of, and to pursue it to completion, serves to preclude his maintenance of this action. Moreover, even assuming plaintiff could establish that he did satisfy his obligation to exhaust available administrative remedies, defendant Gibson's alleged use of force against plaintiff is not legally sufficient to support the only remaining claim in this action. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 22) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     February 10, 2015
           Syracuse, New York



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *et seq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See, e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

*4 Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither the "sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dawes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord**Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murrell v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.FN9

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2007 WL 2789473 (N.D.N.Y.)
**(Cite as: 2007 WL 2789473 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Tony HARRISON, Plaintiff,
v.
David STALLONE, Deputy Superintendent of Pro-
grams, et al., Defendants.

No. 9:06-CV-902 (LEK/GJD).
Sept. 24, 2007.

Tony Harrison, pro se.

Maria Moran, Asst. Attorney General for Defend-
ants.

### DECISION AND ORDER
LAWRENCE E. KAHN, U.S. District Judge.

*1 This matter comes before the Court follow-
ing a Report-Recommendation filed on August 29,
2007 by the Honorable Gustave J. DiBianco,
United States Magistrate Judge, pursuant to 28
U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York. Report-Rec. (Dkt. No. 15).
After ten days from the service thereof, the Clerk
has sent the entire file to the undersigned, including
the objections by Tony Harrison, which were filed
on September 6, 2007. Objections (Dkt. No. 16).

It is the duty of this Court to "make a de novo
determination of those portions of the report or spe-
cified proposed findings or recommendations to
which objection is made." 28 U.S.C. § 636(b). "A
[district] judge ... may accept, reject, or modify, in
whole or in part, the findings or recommendations
made by the magistrate judge." *Id.* This Court has
considered the objections and has undertaken a de
novo review of the record and has determined that
the Report-Recommendation should be approved
for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation
(Dkt. No. 15) is **APPROVED** and **ADOPTED** in
its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion to dis-
miss (Dkt. No. 12) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt.
No. 1) is **DISMISSED IN ITS ENTIRETY;** and it
is further

**ORDERED,** that Plaintiff's Motion for a tem-
porary restraining order (Dkt. No. 16) is **DENIED
AS MOOT;** and it is further

**ORDERED,** that the Clerk serve a copy of this
Order on all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION
GUSTAVE J. DI BIANCO, United States Magis-
trate Judge.

This matter has been referred to me for Report
and Recommendation by the Honorable Lawrence
E. Kahn, United States District Judge pursuant to
28 U.S.C. § 636(b) and Local Rules N.D.N.Y.
72.3(c).

In this civil rights complaint, plaintiff alleges
that defendants retaliated against him for the exer-
cise of plaintiff's First Amendment right to file a
grievance regarding the conditions in the law lib-
rary at Auburn Correctional Facility. (Dkt. No. 1).
Presently before the court is defendants' motion to
dismiss the complaint pursuant to FED. R. CIV. P.
12(b)(6) for failure to exhaust administrative rem-
edies. (Dkt. No. 12). Plaintiff has responded in op-
position to defendants' motion. (Dkt. No. 14).

### DISCUSSION
**1. *Motion to Dismiss***
A court may not dismiss an action pursuant to
Rule 12(b)(6) unless "it appears beyond doubt that
the plaintiff can prove no set of facts in support of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789473 (N.D.N.Y.)
**(Cite as: 2007 WL 2789473 (N.D.N.Y.))**

his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (citing *inter alia Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The court must accept the material facts alleged in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546 (1964) (per curiam)). In determining whether a complaint states a cause of action, great liberality is afforded to *pro se* litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

**\*2** When considering a motion to dismiss for failure to state a claim, the court may consider the complaint, together with any documents attached as exhibits or incorporated by reference. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1998). The court may also consider public documents and those of which judicial notice may be taken. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773-74 (2d Cir.1991). When matters outside the pleadings are presented, the court may either exclude those matters or treat the motion as one for summary judgment under FED.R.CIV.P. 56. FED. R. CIV. P. 12(b).

## 2. Facts

Plaintiff alleges that on July 1, 2006, defendant Merville "accosted" plaintiff and asked him why plaintiff had complained about Merville. Complaint at p. 4. Plaintiff states that he assured defendant Merville that he did not "write him up," rather, plaintiff was complaining about the allegedly inadequate conditions in the Law Library at Auburn Correctional Facility. *Id.* Plaintiff claims that defendant Merville told plaintiff that Merville would "just have to find something to write [plaintiff] up for." *Id.* Plaintiff claims that on the same day, plaintiff was notified by the company officer that plaintiff was being "keeplocked" by the Law Library officer. On July 2, 2006, plaintiff states that he was issued a misbehavior report by defendant Merville for "eating candy in the library."

Plaintiff states that he remained "keeplocked" FN1 for 23 hours per day until the disciplinary hearing on July 5, 2006. Plaintiff states that he was

found guilty of the misbehavior and received "time served" and a five dollar surcharge. Plaintiff states that on July 18, 2007, he was told by a Law Clerk that plaintiff was "being targeted by every shift in the Law Library" for complaining about the conditions in the Law Library. Complaint at p. 5.

> FN1. "Keeplock" is a form of confinement where the inmate is confined to his own cell. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

Plaintiff claims that he spoke with defendant Stallone on July 18, and plaintiff told defendant Stallone what the Law Clerk had said. Plaintiff claims that defendant Stallone told plaintiff that he "need[ed] to be harassed because defendant Stallone had to respond to plaintiff's grievance about the Law Library. *Id.* Plaintiff claims that later in the day on July 18, 2006, plaintiff was keeplocked by defendant Womak FN2 and was issued a misbehavior report on July 19, 2006, charging plaintiff with stealing or misusing state property. Plaintiff states that defendant Womak charged plaintiff with looking through a book that was given to plaintiff by another inmate. *Id.* Plaintiff claims that he was keeplocked for 23 hours until the disciplinary hearing. Complaint at p. 5.

> FN2. Plaintiff states that defendant Womak is also a Law Library officer. Complaint at p. 5.

Plaintiff claims that defendants Merville and Womak violated plaintiff's First Amendment rights by retaliating against him for complaining about the Law Library. Plaintiff also claims that defendant Stallone did nothing to stop their actions, despite being told about their conduct by plaintiff.

## 3. Exhaustion of Administrative Remedies

**\*3** Defendants argue that plaintiff has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement applies to **all inmate suits about prison life,**

whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004). The Supreme Court has recently held, agreeing with the Second Circuit, that the exhaustion requirement is an ***affirmative defense,*** not a jurisdictional prerequisite. *Jones v. Bock,* 127 S.Ct. 910, 921 (2007); *Giano v. Goord,* 380 F.3d at 675-76. The Second Circuit has also held that there are instances in which the exhaustion requirement may either be waived or excused. *Id.* at 675. (citations omitted).

Additionally, as with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies. *McCoy v. Goord,* 255 F.Supp.2d 233, 247-48 (S.D.N.Y.2003). Where questions of fact exist as to exhaustion, summary dismissal [FN3] is not appropriate. *Pendergrass v. Corrections Officers,* 01-CV-243A, 2004 U.S. Dist. LEXIS 28224, *6-7 (W.D.N.Y. Sept. 1, 2004). At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v.. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

FN3. The court in *Pendergrass* was referring to summary judgment under FED. R.

CIV. P. 56. The motion in this case is one to dismiss under Rule 12(b)(6), and the court may, therefore, only rely upon the statements made in the complaint.

Pursuant to these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The court notes that the Supreme Court's decision in *Woodford v.. Ngo,* 126 S.Ct. 2378 (2006) may have changed the law regarding possible exceptions to the exhaustion requirement. In *Woodford,* the Supreme Court held that the PLRA's exhaustion requirement mandates "proper" exhaustion of administrative remedies. In *Woodford,* the plaintiff filed a grievance that was rejected as "untimely." *Id.* at 2384. Woodford appealed the procedural denial through the administrative process, and "technically" exhausted his administrative remedies because there were no administrative remedies "available" to him. *Id.* However, the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Id.* at 2387. "Proper" exhaustion means that the inmate must complete the administrative review process ***in accordance with the applicable procedural rules,*** including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 2385-93 (emphasis added).

**\*4** It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. In fact, based upon the concurring opinion in *Woodford,* it appears that these decisions have ***not*** been overruled in that respect. In that concurring opinion, Justice Breyer specifically noted that two circuits, the ***Second*** Cir-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 126 S.Ct. at 2393 (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates." Id.* (emphasis added).

The Second Circuit has not specifically considered the effect that *Woodford* may have had on *Giano-Hemphill* line of cases.[FN4] However, in *Ruggiero v. County of Orange,* 467 F.3d 170, 175-76 (2d Cir.2006), the Second Circuit stated that it did not need to determine what effect *Woodford* has upon the Second Circuit case law in the exhaustion area because in *Ruggiero,* the court found that plaintiff would not have prevailed even assuming the continued validity of the ability to "excuse" non-exhaustion. *See also Reynoso v. Swezey,* No. 06-1835-pr, 2007 U.S.App. LEXIS 15105, *4 (2d Cir. June 25, 2007) (unpublished order) (continuing to state that the court was not deciding whether the decision in *Woodford* affected Second Circuit case law). In *Sloane v. Mazzuca,* the court stated that it would follow the "current" law in the Second Circuit until the Second Circuit specifically addressed the issue. *Sloane v. Mazzuca,* 04-CV-8266, 2006 U.S. Dist. LEXIS 79817, *19-20 (S.D.N.Y. Oct. 31, 2006) (citation omitted).

> FN4. The court does note that the Second Circuit has decided that to the extent that its decision in *Braham v. Casey,* 425 F.3d 177, 183 (2d Cir.2005) supported a plaintiff's argument that would have allowed for less than "proper exhaustion," it was overruled by *Woodford. See Loera Macias v. Zenk,* 2007 U.S.App. LEXIS 17795, * 16-17 (2d Cir. July 26, 2007).

The issue upon which *Braham* was overruled involved whether "informal complaints" would be sufficient to exhaust a claim. In *Loera Macias,* the Second Circuit implied that the "exceptions" to exhaustion, including availability, estoppel, and special circumstances continued to exist. *Id.* at *19-22.

The Supreme Court cited *Woodford* in *Jones v. Bock,* explaining that the holding in *Woodford* only imposed a requirement that in order to properly exhaust administrative remedies, the inmate must " 'complete the administrative review process in accordance with the applicable procedural rules.' " *Jones,* 127 S.Ct. at 922 (citing *Woodford,* 126 S.Ct. at 2384). These rules are defined by the prison grievance process itself, and not by the PLRA. *Id.* In *Jones,* the Court ultimately held that exhaustion was not *per se* inadequate simply because a defendant that was later named in the civil rights complaint was not named in the grievance. *Id.* at 923.

New York State provides inmates with a grievance procedure to follow by which inmates may file complaints and appeal adverse decisions. N.Y. CORRECT. LAW § 139; N.Y. COMP.CODES R. & REGS. tit. 7 §§ 701.1 *et seq.* (N.Y.CRR). The regular Inmate Grievance Program (IGP) consists of a three-tiered process. *Hemphill,* 380 F.3d at 682. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). *Id.* §§ 701.5(a)(1) and (b).[FN5] An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). Time deadlines apply at all levels of the process, but exceptions to any of the deadlines may be made based on "mitigating circumstances." *Id.* §§ 701.5(a)(1); 701.6(g). An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams,* 349 F.Supp.2d 677, 682 (S.D.N.Y.2004).

> FN5. The court notes that the sections gov-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

erning inmate grievances were re-numbered in 2006. This court will refer to the current numbering which is different than the numbers that appear in *Hemphill*.

**\*5** There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8(a). The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id.* § 701.8(b). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house", by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id.* § 701.8(h). A similar "special" procedure is provided for claims of discrimination against an inmate. *Id.* § 701.9.

In this case, plaintiff concedes that he did not file any grievances regarding defendants' behavior. Complaint at p. 2. Plaintiff states that his reason for failing to file a grievance was fear of retaliation. *Id.* at p. 3. Defendants argue that a "general fear" of retaliation will not excuse plaintiff's failure to exhaust. Defendants' Memorandum of Law at p. 3. Because the Second Circuit has not specifically held that the "exceptions" to the exhaustion requirement have been affected by *Woodford,* this court will still evaluate this case pursuant to the three-part *Brownell* test to determine if the exhaustion requirement has been waived or may be excused.

Plaintiff does not claim that the administrative

procedure was not literally "available" to him. In fact, as stated above, there is a special procedure to bring grievances alleging harassment or discrimination against facility employees. 7 N.Y.C.R.R. §§ 701.8 & 701.9. Plaintiff, however, claims that the grievance procedure was not "available" due to the fear of retaliation or that the fear of retaliation constitutes a "special circumstance" excusing his failure to exhaust.[FN6] It has been held that a "general fear" of retaliation is *not* sufficient to excuse the exhaustion requirement. *See Hines v. Valhalla County Corr.,* 01 Civ. 6935, 2002 U.S. Dist. LEXIS 14550, \*10-11 (S.D.N.Y. Aug. 8, 2002). If an inmate could simply state that he feared retaliation, there would be no point in having a grievance procedure because as District Judge Scheindlin stated in *Hines,* "any inmate complaint can result in retaliation." *Id.*

> FN6. Plaintiff could also argue that the defendant's past allegedly retaliatory conduct estops them from raising the failure to exhaust as a defense.

However, it has also been held that grievance procedures may be rendered "unavailable" because of a "reasonable fear of retaliation." *Thomas v. Cassleberry,* 03-CV-6394, 2007 U.S. Dist. LEXIS 30129, \*3-6 (W.D.N.Y. April 24, 2007). In *Thomas,* the court found that plaintiff's fears were "reasonable" due to his allegations concerning widespread beatings and shacklings shortly after a "mini-riot" at Southport Correctional Facility. *Id.* These allegations, together with plaintiff's claim that he was personally threatened by defendants if he did not "drop it" were sufficient to create a "reasonable fear of retaliation," rendering the grievance procedure "unavailable" to plaintiff and excusing his failure to exhaust. *Id.* at \*3.

**\*6** In this case, the court cannot find that plaintiff had a "reasonable fear" of retaliation. The case is distinguishable from *Thomas* in which plaintiff had alleged that he was involved in a riot and that there had been other beatings. Plaintiff in this case simply stated in the complaint that he was

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"afraid of retaliation." In plaintiff's response to defendants' motion to dismiss, he appears to claim that he had a "legitimate fear" of retaliation because his substantive claim is one for retaliation, and that he has been the subject of retaliation in the past. (Dkt. No. 14 at 6).

If every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims. This is a result that the court does not believe was contemplated by the PLRA or by the Second Circuit in analyzing possible exceptions to the exhaustion requirement. Additionally, a general exception to the exhaustion requirement would eliminate the need for, or the use of, the special provisions in the New York State regulations for claims of employee harassment. Thus, plaintiff has not alleged either that the grievance procedures were "unavailable," nor has he sufficiently alleged that there were "special circumstances" that caused his failure to exhaust his administrative remedies.

In his response to defendants' motion to dismiss, plaintiff argues that the defendants are relying on plaintiff's "confusion" over the proper grievance procedure. (Dkt. No. 14 at 6). It is unclear to what "confusion" plaintiff is now referring. He clearly knew what the grievance procedures were, since his substantive claim in this action is that defendants retaliated against him for using those grievance procedures. Thus, he could not have been "confused" about how to bring a grievance. He does not specify in his memorandum of law what that confusion was.

Finally, plaintiff argues that there are special circumstances justifying his failure to exhaust because plaintiff was transferred to another facility. (Dkt. No. 14 at 7). The court notes that the last allegedly retaliatory action by defendants occurred on July 19, 2006 when defendant Womak issued plaintiff a misbehavior report, charging him with violating a rule prohibiting stealing or misusing state property. (Dkt. No. 1 at ¶ 6). Plaintiff was not transferred to Sullivan Correctional Facility until July 31, 2006, eleven days later. Although the grievance may not have been decided before plaintiff was transferred, plaintiff had plenty of time to *file* a grievance under section 701.8, providing for an expedited procedure in cases of harassment.

The court also notes that the regulations provide for the processing of grievances and appeals after transfer. 7 N.Y.C.R.R. § 701.6(h). This section specifically provides that the response to a grievance filed by an inmate who has been transferred will be mailed to the inmates new facility, and an inmate transferred to another facility "may continue an appeal of any grievance." *Id.* §§ 701.6(h)(1) & (h)(2). Thus, the fact that plaintiff was transferred to another facility eleven days after the last incident does not excuse his failure to pursue the grievance procedures.

**\*7 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 12) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2007.
Harrison v. Stallone
Not Reported in F.Supp.2d, 2007 WL 2789473 (N.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jason A. KETCHUCK, Plaintiff,
v.
Brad A. BOYER, Defendant.
No. 3:10–CV–870 (TJM / DEP).

Oct. 25, 2011.
Jason A. Ketchuck, Endicott, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany, NY, for Defendant.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

## I. INTRODUCTION

*1 Plaintiff Jason A. Ketchuck commenced this action *pro se* asserting claims of false arrest, malicious prosecution, and abuse of process pursuant to 42 U.S.C. § 1983. *See* Compl., dkt. # 1. Defendant moves for summary judgment seeking to dismiss the action in its entirety. *See* Motion, dkt. # 15. In opposition, Plaintiff filed only affidavits from himself and his father. *See* Opp., dkt. # 18.[FN1] Defendant has filed a reply. *See* Reply, dkt. # 19. The Court has determined to decide the motion based upon the submissions alone. *See* N.D.N.Y.L.R. 7.1(h) ("In the district court judge's discretion ..., the district court judge may dispose of a motion without oral argument. Thus, the parties should be prepared to have their motion papers serve as the sole method of argument on the motion.").

> FN1. Plaintiff was served with the Northern District's standard summary judgment notification for *pro se* litigants, *see* dkt. # 15–1. This notification provided, *inter alia,*
>
> Pursuant to Local Rule 7.1 of the Northern District of New York, you are required to submit the following papers in opposition to this motion: (I) a memorandum of law (containing relevant factual and legal argument); (ii) one or more affidavits in opposition to the motion and (iii) a short and concise statement of material facts as to which you claim there are genuine issues in dispute. These papers must be filed and served in accordance with the time set by Local Rule 7.1.
>
> If you do not submit a short and concise statement of material facts as to which you claim there are genuine issues in dispute, all material facts set forth in the statement filed and served by the defendant(s) shall be deemed admitted.

## II. STANDARD OF REVIEW

The Court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must show, by affidavits or other evidence, admissible in form, that there are specific factual

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment." *Viscusi v. Proctor & Gamble,* 2007 WL 2071546, at * 9 (E.D.N.Y. July 16, 2007).

In determining whether to grant summary judgment, the Court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita.,* 475 U.S. at 586, or by a factual argument based on "conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

**\*2** The Local Rules of the Northern District require a party moving for summary judgment to submit a "Statement of Material Facts" which sets forth, with citations to the record, each material fact about which the moving party contends there exists no genuine issue. N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local Rule 7.1(a)(3) Statement is submitted, the party opposing the motion must

> file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

*Id.* (underscoring in original).

The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly. *See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648–49 (2d Cir.2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a) (3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (*per curiam* ) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103 F.Supp.2d 104, 108 (N.D.N.Y.2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations—specific or otherwise—to the record") (emphasis in original); *McKnight v. Dormitory Auth. of State of N.Y.,* 189 F.R.D. 225, 227 (N.D.N.Y.1999) (McAvoy, J.) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999) (McAvoy, J.) (deeming admitted all facts in defendants' Rule 7.1(a) (3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

While the Court must construe a *pro se* litigant's pleadings and papers liberally and interpret them to raise the strongest arguments that they suggest, *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003); [FN2] *Veloz v. New York,* 339 F.Supp.2d 505, 513 (S.D.N.Y.2004), the application of this lenient standard does not relieve a *pro se* litigant of the requirement to follow the procedural formalities of Local Rule 7.1(a)(3). *Govan,* 289 F.Supp.2d at 295; *see also Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS,* 59 F.3d 5, 8 (2nd Cir.1995) ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

generally are required to inform themselves regarding procedural rules and to comply with them.").

> FN2. To construe pleadings liberally means the Court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan,* 289 F.Supp.2d at 295.

**III. BACKGROUND**

**\*3** Because Plaintiff has not submitted an opposing Statement of Material Facts, the properly supported facts set forth in Defendant's Statement of Material Facts are deemed admitted for purposes of this motion. N.D.N.Y.L.R. 7.1(a)(3). Except where indicated otherwise, the following facts are taken from Defendant's Statement of Material Facts.

Defendant Brad A. Boyer is a uniformed New York State Trooper assigned to the Owego Barracks of Troop C of the New York State Police, headquartered in Sidney, New York. On October 22, 2008, he responded to a call from an individual named Carol A Smith who complained that Plaintiff Jason Ketchuck, one of the sons of her next door neighbor, had repeatedly driven his vehicle through her yard, and that the most recent occasion on which this had occurred was at approximately 7:38 AM on October 22, 2008. She complained that this course of conduct had caused rutting and damage to her front lawn.

Upon responding to the call, Trooper Boyer observed the rutting and damage to Ms. Smith's lawn alongside the roadway in front of her house, and took a series of photographs of the lawn. Trooper Boyer took a sworn statement from Ms. Smith on October 22, 2008, and she signed a Complaint against Jason A. Ketchuck on the same date accusing him of Trespass, in violation of New York Penal Law § 140.05. Based upon the information provided by Ms. Smith and the property damage that he observed and photographed on October 22, 2008, Trooper Boyer also prepared and signed an Information charging Jason A. Ketchuck with Criminal Mischief in the Fourth Degree.

On October 31, 2008, Trooper Boyer requested that Plaintiff come to the Owego Barracks to meet with him

concerning Ms. Smith's complaint, which he did. Mr. Ketchuck admitted that he had been the driver of the small grey car on the date and time that had been the subject of Ms. Smith's complaint; however, he denied that he had driven the car on her lawn. Mr. Ketchuck also contended that the ruts near the road were on property that was abandoned by the Town of Owego in 1934 and that, although Ms. Smith "extended the landscaping of her property onto the abandoned road without the Town's permission" seven (7)years prior, his father was claiming ownership of this property in a quite title action in New York State Supreme Court. Jason Ketchuck Aff., ¶ 9; *see* James Ketchuck Aff., ¶¶ 2, 8. Ketchuck's father also contends that, prior to charges being levied against his son, he met with Trooper Boyer and attempted to show Trooper Boyer "property maps, surveys, deeds, and town records which set forth the property lines and boundaries of the property owned by [Ms.] Smith," but Trooper Boyer "refused to look at them." James Ketchuck Aff., ¶¶ 6–7.

Trooper Boyer issued Plaintiff an appearance ticket charging him with Trespass in violation of Penal Law § 140.05 and Criminal Mischief in the Fourth Degree in violation of Penal Law § 145. After issuing the appearance ticket to Jason A. Ketchuck on October 31, 2008, Trooper Boyer did not have any further involvement in the prosecution of this case. The charges were Dismissed in the Interest of Justice in the Owego Town Court on May 27, 2009.

**IV. DISCUSSION**

*a. False Arrest*

**\*4** Plaintiff claims that he was falsely arrested by Defendant. A false arrest claim, whether brought under federal or state law,[FN3] will fail if, at the time of the seizure, the arresting officer had probable cause to make an arrest. *Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003); *Smith v. Edwards,* 175 F.3d 99, 105 (2d Cir.1999); *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *see Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

known to the arresting officer at the time of the arrest." *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 593, 160 L.Ed.2d 537 (2004) (citing *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)).

> FN3. Plaintiff asserts claims only under federal law pursuant to 42 U.S.C. § 1983. However, given Plaintiff's *pro se* status, the Court examines the potential supplemental state law claims that might be asserted.

"Probable cause exists if at the time of the arrest 'the facts and circumstances within th[e officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Amore v. Novarro,* 624 F.3d 522, 536 (2d Cir.2010 (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)); *see Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999)". The relevant inquiry is whether "probable cause existed to arrest a defendant" and "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly,* 439 F.3d at 154; *see Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (probable cause to arrest can exist even if offense relied upon is not even "closely related" to offense charged). "A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego,* 820 F.Supp. 54, 55 (N.D.N.Y.1993), *aff'd,* 52 F.3d 310 (2d Cir.1995). "[T]he eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Hahn,* 820 F.Supp. at 55 (citing *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)).

"It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (quoting *Miroslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd* 993 F.2d 1534 (2d Cir.1993)). "If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable ... merely because it later turns out that the complaint was unfounded." *Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997); *see Calderola v. Calabrese,* 298 F.3d 156, 165 (2d Cir.2002) ("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that might not be the case."). Once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997); *see Coons v. Casabella,* 284 F.3d 437, 441 (2d Cir.2002) ("[P]olice officers are not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); *Hotaling v. LaPlante,* 67 F.Supp.2d 517, 522 (N.D.N.Y.2001) (valid probable cause to arrest rested upon information supplied by an identified witness, and even though a further investigation by the Trooper would have led to a contradictory conclusion, Trooper's conduct was not unreasonable under the circumstances).

**\*5** Where the facts surrounding the arrest are uncontroverted, the determination as to whether probable cause existed may be made by the Court as a matter of law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Even where factual disputes exist, a § 1983 claim may fail if the plaintiff's version of events is sufficient to establish probable cause to arrest. *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 133 (E.D.N.Y.1998).

Here, the alleged victim provided Defendant with a sworn statement that Plaintiff repeatedly drove his vehicle over a portion of her lawn causing damage to it. The victim's statement was corroborated by the tire marks and the ruts in the lawn which Defendant observed and photographed; and by Plaintiff's admission that he was the driver of the car alleged to have caused damage to the lawn. These facts provided more than ample probable cause for Defendant to believe that Plaintiff committed the offense of Trespass under Section 140.05 of the New York Penal Law.[FN4] In this regard, the facts provided probable cause to believe that Plaintiff had intentionally driven his car across Ms. Smith's lawn on October 22, 2008; that she

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

did not consent to his doing so; and that Plaintiff's conduct on his neighbor's property, which had caused observable damage to the lawn, was not conduct that Plaintiff was licensed or privileged to engage in. *See Caidor v. Harrington,* 2009 WL 174958 (N.D.N.Y.2009) (Suddaby, J.) (granting summary judgment dismissing § 1983 false arrest claim based on arrest for violation of P.L. § 140.05). Moreover, these same facts provided ample probable cause to believe that Plaintiff had committed the offense of Criminal Mischief in the Fourth Degree in violation of N.Y. Penal Law § 145 [FN5] in that the facts, including the allegation that Plaintiff's car was repeatedly driven on the lawn, provided probable cause to believe that Plaintiff intentionally damaged Ms. Smith's property by driving his car on it.

> FN4. Section 140.05 of New York Penal Law provides that "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises. Trespass is a violation." "Premises" is defined to include any "building" or "real property." Penal Law 140.00(1). Penal Law § 140.00(5) provides that a person "enters or remain(s) unlawfully upon premises when he is not licensed or privileged to do so."

> FN5. In relevant part, Penal Law § 145 provides:

> A person is guilty of criminal mischief in the fourth degree when, having no right to do so nor any reasonable ground to believe that he or she has such right, he or she:

> 1. Intentionally damages property of another person[.]

> "While no statutory definition of 'damages' is provided, it is commonly recognized that the term contemplates 'injury or harm to property that lowers its value or involves loss of efficiency' and that only 'slight' damage must be proved" to establish a violation of Penal Law § 145. *People v. Collins,* 288 A.D.2d 756, 758, 733 N.Y.S.2d 289 (3d Dept.2001).

Because a police officer need not explore every

theoretically plausible claim of innocence before making an arrest, and because the existence of probable cause is determined by a standard far less burdensome than determining guilt, Defendant's probable cause determination is not negatively affected by Plaintiff's assertion of innocence or by Defendant's failure to review the property maps or surveys. [FN6] A police officer is not required to conduct an investigation if the facts demonstrate that probable cause exists that an offense has been committed. Accordingly, Defendant was not required to conduct independent research into who actually owned the property claimed by Ms. Smith as her front lawn before issuing the appearance ticket. This is especially so in light of the undisputed facts that the tire marks were on property abutting Ms. Smith's front lawn and on a piece of property over which Ms. Smith purportedly "extended the landscaping of her property" some seven (7) years prior to the incident. These facts provided reasonable corroboration for Ms. Smith's sworn statement that the tire marks and ruts were on her property.

> FN6. Defendant denies that the purported property dispute regarding the subject portion of Ms. Smith's front yard was ever articulated to him. Regardless, even if a property dispute regarding the subject property was articulated to Defendant, he was not required to a perform a title search or make additional inquiry to resolve the dispute in light of the sworn statement by Ms. Smith that the property in question belonged to her.

**\*6** Even assuming, *arguendo,* that actual probable cause did not exist to satisfy the demands of the Fourth Amendment, arguable probable cause existed such to entitle Defendant to qualified immunity. *See Zellner v. Summerlin,* 494 F.3d 344, 369–70 (2d Cir.2007) (discussing "arguable probable cause" as basis for qualified immunity). Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Amore,* 624 F.3d at 536 (citing *Walczyk v. Rio,* 496 F.3d 139, 163 (2d Cir.2007)). To determine whether an officer had arguable probable cause, the objective information he possessed at the time

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

of the arrest is examined, not the "subjective intent, motives or beliefs" of the officer. *Id.* Here, the information Defendant possessed at the time he issued the appearance ticket provided an objectively reasonable basis for him to believe that probable cause existed for the two offenses with which Plaintiff was charged. Accordingly, Defendant is entitled to qualified immunity on the false arrest claim because it was objectively reasonable for him to believe that his acts did not violate Plaintiff's clearly established rights under the Fourth Amendment. *Id.* at 530 ("[Q]ualified immunity ... is sufficient to shield executive employees from civil liability under § 1983 if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable [for them] to believe that their acts did not violate these clearly established rights."). For these reasons, the false arrest claim is dismissed.

**b. Malicious Prosecution**

Based on the undisputed facts that supplied Defendant with actual probable cause to believe that Plaintiff committed the two offenses for which he was charged, the malicious prosecution claim also fails as a matter of law. *See Rohman v. New York City Transit Auth.,* 215 F.3d 208, 215 (2d Cir.2000) (an element of a malicious prosecution claim is that the defendant lacked probable cause to believe the proceeding could succeed).

Moreover, to state a claim for malicious prosecution under either § 1983 or New York state common law, Plaintiff must establish, *inter alia,* "termination of the proceeding in [the accused's] favor." *Green v. Mattingly,* 585 F.3d 97, 104 (2d Cir.2009). Whether termination is deemed favorable to the accused is determined in accordance with applicable state law, here, New York law. *Hygh v. Jacobs,* 961 F.2d 359, 367 (2d Cir.1992). Proceedings are "terminated in favor of the accused" when their final disposition is such as to indicate the accused is not guilty. *DiBlasio v. City of New York,* 102 F.3d 654, 657 (2d Cir.1996). "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." *Fulton v. Robinson,* 289 F.3d 188, 196 (2d Cir.2002). A dismissal "in the interest of justice" under New York Criminal Procedure Law § 170.40 "cannot provide the favorable termination required

as the basis for a claim of malicious prosecution." *Hygh,* 961 F.2d at 368 (citing *Ryan v. N.Y. Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 493 (1984)). Thus, Plaintiff cannot establish the "favorable termination" element of his malicious prosecution claim.

**\*7** Further, the undisputed facts are that Trooper Boyer never had any prior contact with either Mr. Ketchuck or Ms. Smith before this incident. He attested that he harbored no improper motive in instituting the charges, and that he issued the appearance ticket and filed the accusatory instruments in the Town Court only because of his good faith belief that there was the probable cause to pursue such charges. *See* Boyer Aff. ¶¶ 11, 13. There are no facts from which a reasonable fact finder could conclude that Trooper Boyer instituted the underlying proceeding with a malicious motive or intent such to state a viable malicious prosecution claim. *See Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir.2010) (to prevail on a malicious prosecution claim, a plaintiff must establish, *inter alia,* that the proceeding was begun with malice); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996) (malice may be proven by showing that the prosecutor had "a wrong or improper motive, something other than a desire to see the ends of justice served") (internal quotation marks omitted).

Finally, for the reason discussed above with regard to Trooper Boyer's entitlement to qualified immunity on the false arrest charge, he is also entitled to qualified immunity on the malicious prosecution claim. That is, under the circumstances it was objectively reasonable for reasonable officers to believe that there was probable cause to commence the prosecution for the offenses charged. Accordingly, the malicious prosecution claim is dismissed.

**c. Abuse of Process**

Plaintiff's third claim against Trooper Boyer is for malicious abuse of process in connection with the institution of the Town Court proceeding. "In the criminal context, malicious abuse of process is by definition a denial of procedural due process.... Procedural due process forbids the use of legal process for a wrongful purpose." *Abreu v. Romero,* 2010 WL 4615879, at \*8

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

(S.D.N.Y. Nov.9, 2010) (citation omitted). To state a claim for the malicious abuse of process, Plaintiff must prove that the Defendant (1) employed regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003). "The pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." *Lopez v. City of New York,* 901 F.Supp. 684, 691 (S.D.N.Y.1995) (citing PSI *Metals v. Firemen's Ins. Co.,* 839 F.2d 42, 43 (2d Cir.1988)). In other words, Plaintiff "must claim that [Defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino,* 331 F.3d at 77. "In New York, such wrongful purposes have included economic harm, extortion, blackmail, and retribution." *Abreu,* 2010 WL 4615879, at *8 (citing *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 404, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975)).

**\*8** Plaintiff's malicious abuse of process claim fails as the facts are devoid of any allegations concerning any "collateral objective" that Defendants may have had in instituting criminal charges against Plaintiff. There is no factual basis upon which a reasonable fact finder could conclude that the issuance of the appearance tickets to Plaintiff was motivated by anything other than Trooper Boyer's good-faith belief that he had probable cause to conclude that Plaintiff had engaged in conduct that constituted trespass and/or criminal mischief. Furthermore, there is no evidence that Trooper Boyer had any involvement in the prosecution of the case against Plaintiff after he issued the appearance tickets on October 31, 2008. Under these uncontested facts, the claim fails as a matter of law.

Finally, and assuming *arguendo* that a viable malicious prosecution claim existed, Trooper Boyer is entitled to qualified immunity on the claim in that there existed, at the least, arguable probable cause to commence the criminal proceeding. This arguable probable cause provides an objectively reasonable justification for issuing process commencing the underlying proceeding. *Cf. Abreu,* 2010 WL 4615879, at *8 ("While probable cause

is not an element of an abuse of process claim, under New York law, a showing of probable cause at the time process issued suffices ... to establish excuse or justification for the purposes of a defense to abuse of process.") (internal quotation marks and citation omitted). Accordingly, the abuse of process claim is dismissed.

**V. CONCLUSION**

For the reasons discussed above, Defendant's motion for summary judgment [dkt. # 15] is **GRANTED** and all claims in this case are **DISMISSED.**

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Ketchuck v. Boyer
Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1113584 (W.D.N.Y.)
**(Cite as: 2012 WL 1113584 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Guy McEACHIN, Plaintiff,
v.
Leonard BEK, et al., Defendants.

No. 06–CV–6453 (MAT).
April 2, 2012.

Guy McEachin, Brooklyn, NY, pro se.

Stephanie Joy Calhoun, Office of the Attorney General, Buffalo, NY, for Defendants.

DECISION AND ORDER
MICHAEL A. TELESCA, District Judge.
**I. Introduction**
**\*1** *Pro se* plaintiff Guy McEachin ("McEachin" or "Plaintiff"), an inmate at Attica Correctional Facility ("Attica" or "the Facility") instituted the instant proceeding pursuant to 42 U.S.C. § 1983. Presently pending before the Court are Defendants' motions for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt.55 & 91) on behalf of the parties who have been served in this action: Leonard Bek ("Bek"), Family Reunion Program Coordinator at Attica; Sandra Dolce ("Dolce"), the Deputy Superintendent of Programs at Attica; John Roach ("Roach"), Senior Corrections Counselor and Chairperson of the Program Committee at Attica; Mark J. Leonard ("Leonard"), Director of the Ministerial, Family & Volunteer Services for the New York State Department of Correctional Services and Community Supervision ("NYSDOCCS"); John Whiteford ("Whiteford"), a Corrections Counselor at Attica; James Conway ("Conway"), Superintendent of Attica; Randy James ("James"), Deputy Superintendent of Security at Attica; Vance Hawley ("Hawley"), Darlene Buckley ("Buckley"), and Jennifer Boyce ("Boyce"), all Registered Nurses at Attica; Lisa

Trapasso ("Trapasso"), a Mental Health Therapist who oversees clinical health services in Attica's Special Housing Unit ("SHU"); and Tom Edwards ("Edwards"), a Physician's Assistant at Attica.

For the reasons that follow, Defendants' Motions for Summary Judgment (Dkt. 55 & 91) are granted, and the Amended Complaint (Dkt.# 34) is dismissed in its entirety.

**II. Factual Background**
Plaintiff's supporting allegations cover numerous, disparate topics. To avoid unnecessary repetition, the facts pertinent to the alleged constitutional violations will be set forth below in the sections addressing Plaintiff's specific claims.

**III. General Legal Principles**

**A. Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must assess whether there are any material factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Although "pro se litigants are afforded some latitude in meeting the rules governing litigation[.]" *Moates v. Barkley,* 147 F.3d 207, 209 (2d Cir.1998), (citations omitted), they, like all litigants, must establish more than a mere "metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), in order to defeat a motion for summary

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

judgment.

**B. 42 U.S.C. § 1983**

**\*2** To state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *E.g., Dwares v. City of N.Y.,* 985 F.2d 94, 98 (2d Cir.1993). The § 1983 plaintiff must adequately demonstrate "personal involvement of defendants in alleged Constitutional deprivations." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Personal involvement "is a prerequisite to an award of damages under § 1983.'" *Id.* (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.994)).

**IV. Plaintiff's Claims**

**A. Denial of Plaintiff's Family Reunion Program Application (Retaliation)**

Plaintiff's due process claims pertaining to the denial of his application to the Family Reunion Program ("FRP") have already been dismissed. *See* Dkt. # 7 at 4–5. The Court (Skretny, D.J.) stated, however, that McEachin might state a cause of action based upon denial of entry into the program to the extent that Defendants' decision was motivated by a retaliatory animus. *Id.* Accordingly, Plaintiff's claims in his amended complaint alleging retaliatory treatment in connection with the denial of the FRP application must be addressed.

**1. Background**

On November 7, 2005, McEachin submitted an application to the FRP. Recommendations were sought from various entities including the Guidance Counselor; security personnel; the Family Services Counselor; the Superintendent of Attica, and the Central Office. Plaintiff's guidance counselor did not recommend approval because Plaintiff had not completed anti-aggression group therapy and had refused to participate in an Alcohol Substance Abuse Treatment program on October 28, 2005. At-

tica's security personnel did not recommend approval based upon McEachin's involvement in a disciplinary incident on November 9, 2005. The Family Services Counselor did not recommend approval based upon McEachin's documented disciplinary history and noted that he needed to complete an anti-aggression and substance abuse treatment program. Both the Superintendent of Attica and the Acting Deputy Superintendent of Programs also recommended denial of the application. On or about January 18, 2006, the Central Office in Albany, New York denied the application. Plaintiff was notified on January 27, 2006, that his application had been disapproved and that he could reapply.

On January 30, 2006, McEachin reapplied for the FRP. On February 3, 2006, Plaintiff was notified that applicants must demonstrate satisfactory behavior throughout the duration of application process. Because he had received keep-lock during the application process, he had not maintained satisfactory behavior, and thus his second FRP application was denied in March 2006.

On September 27, 2006, Leonard notified Plaintiff that he had completed his review of Plaintiff's appeal of the denial of his application to participate in the FRP. Leonard explained that he was not inclined to render a favorable decision, in light of the eight-week sanction in effect due to the period of keep-lock McEachin had received.

**2. Analysis**

**\*3** "[A] claim for relief may be stated under section 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (*per curiam* )). "Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)).

The plaintiff "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating fact in the prison officials' decision to discipline plaintiff." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). The plaintiff must establish that, but for his exercise of a protected right, the alleged wrongful action would not have been taken. *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976).

With regard to the denial of his first FRP request, it appears that McEachin filed two grievances shortly before he submitted the application-one on September 22, 2005, regarding the Facility's refusal to allow McEachin's son to visit; and one on October 26, 2005, for being denied recreation time. The Second Circuit has held "that such temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation." *Colon,* 58 F.3d at 872 (citing, *inter alia, Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Here, however, Defendants have come forward with evidence showing that they would have denied McEachin's FRP applications even if he had not filed grievances. *See Graham,* 89 F.3d at 79 ("[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.") (citing *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)).

As noted above, McEachin had failed to participate in required ASAT programming, which was sufficient reason to deny him entry to FRP. Although Plaintiff contends that the Defendants have falsely accused him of refusing to participate in the ASAT program, he failed to substantiate this allegation during discovery.

With regard to the second FRP application, there is no evidence that Defendants had a retaliatory motive. Even if the decision was partially motivated by improper reasons, which the Court does

not find to be the case, Defendants would have made the same decision based on a proper reason alone-that McEachin had been sentenced to periods of keep-lock during the application-processing period.

**B. Plaintiff's Other Claims of Retaliatory Treatment**

**1. Background**

**\*4** Besides denying his FRP application, Plaintiff asserts that Defendants retaliated against him for filing administrative grievances in other ways. Essentially, his position is that after he files a grievance, something happens that he believes is negative and is an act of retaliation that is related to the filing of the grievance. *See* Deposition of Guy McEachin ("McEachin Dep.") at p. 25, lns 17–23 (Question: "You're basically saying that after you file grievances, something odd happens ... something that you think is related to the grievance, the filing of the grievance. Answer: Right."), attached as Exhibit ("Ex.") A to the Declaration of David J. State, Esq. ("State Decl."). He identified two incidents of alleged retaliation. The first is that medical staff ordered that his medication be "crushed for no reason ." *Id.* at p. 31, lns 21–24. He claimed, "It was usually given to me whole, and then after I came out of the observation room it started being crushed." *Id.* at p. 32, lns 13–16.

The second instance involved his wife allegedly being "harassed" when going through the metal detector three weeks after he had received a felonious ticket for an incident in the visiting room. McEachin Dep. at p. 29, lns 13–25. Plaintiff states that as his wife entered the facility, she went through the metal detector and the metal detector sounded repeatedly. After a number of unsuccessful attempts to pass through, she was provided a robe and then was able to clear the metal detector. *Id.* at p. 30, lns 1–25. She entered the facility and visited Plaintiff without further incident. *Id.*

As discussed further below, the proffered in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cidents of alleged retaliation are entirely de minimis, and evidence of a causal connection between the retaliatory treatment and the protected speech is completely lacking.

### 2. Analysis

Plaintiff filed a grievance regarding the pill-crushing, and the matter was investigated. *See* Bates # 0087–0091, attached to State Decl. The investigation revealed that the Plaintiff's medication dosage had been changed on October 5, 2006. There was an entry on his medical records dated November 7, 2006, from his physician indicating that McEachin's medication should be crushed before it was administered to him. Bates # 0089, attached to State Decl. The medical record indicated that crushing the medication did not affect its potency. *Id.*

In any event, on November 12, 2006, Plaintiff's medication was discontinued at his request. *Id.* Thus, he cannot demonstrate a causal connection between the crushing of his medication and the grievance, since the instruction to crush the medication occurred before he filed his grievance. Moreover, on the date he states that it started being crushed (November 12, 2006), he elected to discontinue the medication, and that request was honored on November 12, 2006, as indicated by the medical records.

Plaintiff clearly has not come close to demonstrating that Defendants "harbored a retaliatory motive" or that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' actions. *Davidson v. Chestnut,* 193 F.3d 144, 148 (2d Cir.1999). Moreover, Defendants have shown by a preponderance of the evidence that they would have acted in the same manner, regardless of the constitutionally protected action of the claimant, and thus the action does not offend the First Amendment. *Mount Healthy,* 429 U.S. at 287. Contemporaneous documentation by Plaintiff's health care provider-who was not involved in the grievance for which he claims he was subject to re-taliation-explains the medical reasons for crushing of Plaintiff's medication.

**\*5** With regard to the alleged harassment suffered by his wife when she passed through the metal detector at Attica, the Court agrees with Defendants that it is simply beyond belief that Attica personnel would rig the metal detector to sound a "false positive" in order to retaliate against McEachin with regard to a disciplinary incident that had occurred three weeks previously. Furthermore, Defendants have shown by a preponderance of the evidence that they would have acted in the same manner, regardless of the constitutionally protected action, and thus the Defendants' conduct does not offend the First Amendment. It is manifest that a maximum security correctional facility may employ metal detectors to screen visitors entering the prison. *See Lowrance v. Achtyl,* 20 F.3d at 535 (noting that in the context of prison administration, courts must bear in mind that prison officials have broad administrative and discretionary authority over the institutions they manage).

As with the pill-crushing incident, Plaintiff has not shown that Defendants were motivated by a retaliatory animus, or that the protected conduct was a substantial or motivating factor in the prison officials' actions. *Davidson,* 193 F.3d at 148.

### C. Denial of Reasonable Accommodations Under the ADA in Connection with Plaintiff's Request to Transfer to a Different Facility

### 1. Background

On March 24, 2006, McEachin requested a transfer to a facility other than Attica so that he could attend an anger-management/alcohol and substance abuse treatment program. He cited a medical condition (a herniated disk for which he was receiving Flexeril (muscle relaxant) and Ultram (pain reliever)), which prevented him from climbing up and down stairs. McEachin Dep. at 13. McEachin contended that Attica did not have the type of programming he required available on the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1113584 (W.D.N.Y.)
**(Cite as: 2012 WL 1113584 (W.D.N.Y.))**

first floor.

When his transfer request was denied, he was informed that he did not need to be moved to a different facility in order to participate in substance abuse and anger management treatment programs. Since both were available on the first floor of Attica, McEachin thus was not required to climb any steps in order to access the programs.

**2. Analysis**

Title II of the Americans With Disabilities Act ("ADA") provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. While the Supreme Court has held that Title II of the ADA extends to prisons, *see Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 213, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), the ADA does not provide for liability against individual defendants in either their individual or official capacities, *see Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) ("Insofar as Garcia is suing the individual defendants in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent that it shields SUNY."). Consequently, all of Plaintiff's ADA claims against the named defendants must fail as a matter of law.

**\*6** Moreover, Plaintiff's claim fail on the merits. To succeed on an ADA claim, Plaintiff must show (1) he is an individual with a disability as defined by the ADA in that he has a physical or mental impairment that substantially limits one or more of his major life activities, (2) he was excluded or denied the benefits of some program, activity or service while at Attica on account of his disability; and (3) the alleged violation was motivated by discriminatory animus or ill will based on his disability.

Assuming that Plaintiff has a qualifying disability, he has failed to demonstrate the second and third elements of a prima facie case. Plaintiff was not excluded from any program, activity, or service because of his disability. The type of program he wished to attend was available on the first floor of Attica and did not require him to climb stairs. Plaintiff does not dispute that such a program existed at Attica; his complaint is that he was denied transfer to a different facility to obtain the same treatment that was available and accessible to him at Attica. Because was not entitled to such a transfer under the ADA, it necessarily follows that Defendants did not act with discriminatory animus in denying his request.

**D. Eighth Amendment Claims**

**1. Excessive Force and Cruel and Unusual Punishment by CO Kingsley**

**a. Background**

On July 10, 2007, McEachin was brought to a private interview with a psychiatrist. When he was taken from the private interview room to another area, CO Kingsley allegedly tried to "stick his fingers in [McEachin's] rectum", and punched him three times in the back of the head with a closed fist while he was handcuffed and pinned up against the wall. McEachin Dep. at 42–43. McEachin's grievance regarding this alleged incident was denied on July 24, 2007. McEachin Dep. at p. 42. CO Kingsley denies that this happened and denies physically or sexually assaulting Plaintiff or treating him improperly in any manner.

**b. Analysis**

**1.) Sexual Assault**

The federal courts have recognized that "[s]exual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm" such that "severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to consti-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tute an Eighth Amendment violation." *Boddie v. Schneider,* 105 F.3d 857, 861 (2d Cir.1997) (citations and quotation omitted). Although "allegations of sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim under Section 1983," *id.,* McEachin nevertheless has failed to establish such a claim.

Even taking McEachin's uncorroborated testimony as true, he asserts only one incident in which he was touched without his consent. The isolated incident, which did not involve actual penetration, was not severe enough to be "objectively, sufficiently serious" for Eighth Amendment purposes. *See Boddie,* 103 F.3d at 861. ("The isolated episodes of harassment and touching [including a CO bumping into him "with her whole body vagina against penis pinning [him] to the door"] alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.") (citing *Farmer,* 511 U.S. at 833–34;) *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (allegation that, on several occasions, correctional officer squeezed inmate's genitals while patfrisking him did not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such touching).

**2.) Physical Assault**

**\*7** CO Kingsley denies having struck McEachin in the head three times with his closed fist. Even assuming that this occurred, McEachin's claim fails because the application of force against him was de minimis. *See Romaine v. Rawson,* 140 F.Supp.2d 204, 212 (N.D.N.Y.2001) ("[T]he prisoner was unable to show any serious injury resulting from Defendant's strikes to his head. The testimony at trial indicated that the strikes to his head were either three open-fisted slaps or three-closed fisted strikes. Regardless of whether the strikes were open-fisted or closed-fisted, given the lack of

any visible injury to Plaintiff, the Court concludes that Defendant's application of force against Plaintiff was de minimis.").

**2. Excessive Force and Cruel and Unusual Punishment by CO Wilkenson**

**a. Background**

On or about July 10, 2007, Plaintiff claims, CO Wilkenson closed an iron feed-up hatch on his "left arm (tricep)", causing pain, numbness, and a scar. *See* Am. Comp., ¶ 80 (Dkt.# 34). The Facility's documentation of the incident indicates that Plaintiff was ordered to put his hands through the cell hatch for removal of restraints after being placed in an SHU cell. Bates # 00326. During this procedure, Plaintiff attempted to pull the handcuffs into the cell. *Id.* Several officers, including CO Wilkenson, pulled the handcuffs back and unshackled Plaintiff. Bates0326, 0341. Nurse Hawley attempted to examine Plaintiff, but he refused the examination and refused to comply with all requests and orders, such as placing his arms near the cell door for examination. Bates0327, 0328. Nurse Hawley noted no injuries (i.e. no gross deformity or abnormality), and noted that Plaintiff had a dressing from a previous self-inflicted wound. *Id.*

**b. Analysis**

Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (citation omitted). The Eighth Amendment's prohibition against "cruel and unusual punishment "necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* (quotations omitted). An excessive force claim contains both a subjective and an objective requirement. *E.g., Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). To fulfill the subjective component, the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *Davidson v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (quoting *Hudson,* 503 U.S. at 9–10). "Thus, the key inquiry under Hudson and its precedents is whether the alleged conduct involved unnecessary and wanton infliction of pain." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (citations omitted).

The contemporaneous documentation by prison personnel supports the conclusion that Plaintiff did not suffer the injuries he claims. At Plaintiff's deposition, Defendants' attorney, David J. State, Esq., asked Plaintiff about any scars. The only one pointed out by Plaintiff was on his left forearm, which is where he cut himself with a razor blade. McEachin Dep. at 57, lns 23–24. Attorney State did not observe any scars on Plaintiff's left tricep, where CO Wilkenson is alleged to have closed the feed-up hatch.

**\*8** Even assuming Plaintiff was injured as he has claimed, I find as a matter of law that the force used was de minimis and therefore cannot form the basis of a constitutional claim. *See Sprau v. Coughlin,* 997 F.Supp. 390, 395 (W.D.N.Y.1998) (corrections officer grabbed inmate behind the neck and hit him several times across the neck and face and in the eye, and the medical report completed after the incident noted a small bump under inmate's eye; amount of force used was de minimis) (citing *Brown v. Busch,* 954 F.Supp. 588, 597 (W.D.N.Y.1997) (finding that an officer's pushing, shoving, and striking of an inmate was a de minimis use of force); *DeArmas v. Jaycox,* No. 92 Civ. 6139(LMM), 1993 WL 37501, at \*4 (S.D.N.Y. Feb.8, 1993) (determining that an officer's punching and kicking of an inmate was a de minimis use of force), *aff'd,* 14 F.3d 591 (2d Cir.1993)).

### 3. Deliberate Indifference by Nurse Hawley

Plaintiff contends that Nurse Hawley was deliberately indifferent to his serious medical needs because he failed to document Plaintiff's injuries after the feed-up hatch incident. This claim fails as a matter of law, for it was Plaintiff's wilful noncompliance which prevented Nurse Hawley him from making an in-depth examination of his alleged injuries. As noted above, Nurse Hawley attempted to examine Plaintiff, but Plaintiff refused to cooperate with the nurse's request to place his arms near the cell-door for examination.

### 4. Imposition of a Restricted Diet (Cruel and Unusual Punishment)

#### a. Background

Plaintiff complains that Defendants violated his Eighth Amendment rights by erroneously placing him on a restricted diet from July 4, 2007, to July 9, 2007, and from August 2, 2007, to August 8, 2007. He claims that the diet was inedible, and caused him to vomit and to become nauseated, weak, and dizzy. Plaintiff also contends that medical staff ignored his medical complaints.

#### b. Analysis

"Although '[t]he Constitution does not require that sentenced prisoners [receive] every amenity which one might find desirable,' *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd* on *other grounds* sub *nom. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (*per curiam* ) (quoting *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir.1980), *cert. denied,* 450 U.S. 1041 (1981)). Plaintiff has failed to raise a triable issue of fact with regard to any of the elements of this standard.

With regard to the period from July 4, 2007, to July 9, 2007, Defendants do not dispute that Plaintiff was punished for failing to turn in his meal tray and other items by being placed on a restricted diet. *See* Bates # 00316, Ex. to State Decl. NYS-DOCCS regulations authorize a restricted diet for an inmate's failure to return eating utensils as this poses a security risk. *See* 7 N.Y . C.R.R. § 304.2;

*James v. Coughlin,* 13 F.Supp.2d 403, 412 (W.D.N.Y.1998) (noting that SHU inmates may be placed on a restricted diet when they refuse to obey a direct order to return a utensil at the conclusion of a meal).

**\*9** Under the applicable regulations, prehearing restricted diets are specifically authorized. *See* 7 N.Y.C.R.R. § 304.2(c). In McEachin's case, the restricted diet was approved by Dr. Laskowski of Attica's medical staff. *See* Bates00316 & 00284, Ex. to State Decl. Medical staff monitored McEachin's health while he was on the diet, and no adverse effects were noted. *See* Bates 00282–00283, Ex. to State Decl. After Plaintiff wrote a letter dated July 30, 2007, to Superintendent Conway complaining about the restricted diet, *see* Bates # 00318, Ex. to Conway Decl., the matter was investigated and it was found that the restricted diet was appropriate. Conway Decl., ¶ 12.

With regard to imposition of the restricted diet in August 2007, Plaintiff wrote a letter to Superintendent Conway complaining about, inter alia, the nutritional value of the loaf, the lack of variety, and the poor quality and the dirtiness of the food. *See* Bates # 00322, Ex. to Conway Decl. Plaintiff's complaints were investigated and found to be without merit. *See* Conway Decl., ¶ 12 & Bates # 00321 (report by Nurse Heltz, noting that "inmate was on the restricted diet from 8–2–07 through 8–8–07. Upon review of his medical file, there's absolutely no documentation of any of these complaints listed in this letter. The PA [Physician's Assistant] makes rounds weekly and none of these complaints were made to him either. I checked with the nurse on rounds in the am and no issues raised at sick call"), Ex. to Conway Decl.

McEachin has failed to raise an issue of fact regarding the propriety of the imposition of the restricted diet. As noted above, prison regulations authorize the imposition of a restricted diet prior to a disciplinary hearing. McEachin admitted at his deposition that he failed to return a utensil at the end of the meal, although he contends he did so in order

to get the officers' attention in relation to complaints he had about the amount of food he was receiving. The regulations do not authorize withholding of utensils for protest purposes.

With regard to the nutritional adequacy of the food, or the cleanliness of the conditions under which it was served, Defendants have come forward with documentation refuting Plaintiff's claims. As a matter of law, McEachin's Eighth Amendment claims premised upon the imposition of a restricted diet on two, relatively brief occasions, fail as a matter of law. *See Leach v. Dufrain,* 103 F.Supp.2d 542, 547 (N.D.N.Y.2000) (holding that denial of hot food to prisoner for two-month period as discipline for misconduct was not cruel and unusual punishment, absent showing of nutritional inadequacy or immediate danger to prisoner's health and well-being).

**5. Unspecified Claims of Deliberate Indifference Against Nurses Boyce and Buckley**

Plaintiff's allegations in the complaint regarding Boyce and Buckley are not specific, and his deposition testimony failed to identify any particulars about their allegedly unconstitutional conduct. Both Boyce and Buckley deny in their Declarations submitted in support of Defendants' Motion for Summary Judgment that they had any interactions with Plaintiff. Accordingly, I find that as matter of law, Boyce and Buckley had no personal involvement with McEachin so as to potentially subject them to liability under 42 U.S .C. § 1983. A state employee cannot be held liable under 42 U.S.C. § 1983 absent an allegation and a showing that he or she was personally involved in the violation of the plaintiff's constitutionally protected rights. *See, e.g., McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) (A defendant's personal involvement in the alleged constitutional deprivation is a prerequisite to obtaining award for damages under 42 U.S. § 1983.), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1979).

**6. Deliberate Indifference by Mental Health Therapist Trapasso**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

### a. Background

**\*10** McEachin complains that Trapasso, a Mental Health Therapist, failed to take appropriate steps to prevent him from harming himself. McEachin testified that he had been placed in the Mental Health Unit ("MHU") for observation after he became depressed, developed insomnia, and began hearing voices as a result of placement in the Special Housing Unit ("SHU"). McEachin Dep. at 35. On or about July 6, 2007, McEachin informed Trapasso that he was not feeling good, was weak because of the restricted diet, was delusional, and felt that he wanted to hurt himself. *Id.* at 38. He testified that she "took it as a joke." *Id.* According to McEachin, Trapasso said to him, "Do whatever you have to do McEachin[,] you're getting no programs from me." Am. Comp., ¶ 68 (Dkt.# 34). Trapasso denies making that or any similar statement.

Subsequently, while he was in the shower, McEachin used a razor blade to inflict a 10–inch laceration on the inside of his left arm. (Apparently, inmates are permitted to have razor blades while they are showering.) He also swallowed several razor blades at the same time. *Id.* at 48. McEachin was taken to Erie County Medical Center where he received 21 staples to close the laceration on his arm and had the razor blades extracted from his stomach. *Id.* at 48.

In her Declaration in support of Defendants' Motion for Summary Judgment, Trapasso gave a markedly different version of events. While screening McEachin upon his admission to SHU, she noted that he had "a history where he will do whatever it takes to get transferred out of correctional facilities" and that he "willingness and motivation for treatment has appeared to be agenda driven." *See* Bates00719–00722, Ex. to Trapasso Decl. For instance, while he was at Southport in June 2007, McEachin was assessed by individuals from the Residential Crisis Treatment Program ("RCTP") who noted, among other things, that he denied suicidal ideation or intention but did not rule out acting out behavior to achieve his goal of getting transferred out of Southport. Bates # 00848, Ex. to Trapasso Decl.

In July of 2007, when the self-harming incident occurred, Trapasso explains that McEachin had four cell-side visits during a one-week period while he was in the SHU. Bates # 00857, Ex. to Trapasso Decl. At that time, staff noted that his suicide risk assessment was "LOW" and that he was adjusting to SHU. *Id.* Trapasso opined that there were "no acute issues, concerns or changes", that there were no acute signs or symptoms, and that the interactions and behavior were consistent with McEachin's diagnosed anti-social personality disorder. *Id.* Trapasso directed that staff should continue to monitor McEachin, whom she described as "manipulative", "entitled", and "demanding". *Id.* Trapasso logged follow-up visits with McEachin from July 9, 2007, to July 13, 2007, and noted no acute problems. Bates # 00867, Ex. to Trapasso Decl.

### b. Analysis

**\*11** There are two elements to a prisoner's claim that officials violated his Eighth Amendment right to receive medical care: The plaintiff must show that he had a " 'serious medical condition' and that it was met with 'deliberate indifference.' " *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (quotation omitted). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Negligence on the part of a health care practitioner, even if it rises to the level of medical malpractice, does not, without more, stated a constitutional claim. *Chance,* 143 F.3d at 703. The Supreme Court has described deliberate indifference as "a stringent standard of fault[,]" *Board of the Cty. Comm'rs of Bryan Cty., Oklahoma v. Brown,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

520 U.S. 397, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997), which is "more blameworthy than negligence," but less culpable than committing "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 834.

Based upon the pleadings in the Amended Complaint and Plaintiff's deposition testimony, the claim against Trapasso appears to be that Plaintiff believed she should have been placed him on "suicide watch" or in some other type of mental health observation unit because he expressed thoughts of self-harm. The Court assumes for purposes of this motion that Plaintiff had a "serious medical need" stemming from his psychiatric issues. *See Meriweather v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987) ("Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a 'serious medical need' under the *Estelle [v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ] formulation.") (citations omitted).

Federal courts faced with similar claims have noted that "[w]hether to place a prisoner on suicide watch and what level of precaution to take with an inmate are issues within a professional medical judgment." *Gay v. Hammersley,* No. 08–59, 2009 WL 596114, at *6 (S.D.Ill. Mar.6, 2009) (citing *Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 261 (7th Cir.1996) (noting the distinction between a "medical judgment" and deliberate mistreatment: "a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment" and "[a]t most it is medical malpractice ...")). It is well settled that "mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation." *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986); *see also Estelle v. Gamble,* 429 U.S. at 107.

McEachin's mere disagreement with Trapasso's assessment of his mental health status is not an actionable Eighth Amendment claim for purposes of 42 U.S.C. § 1983. *Accord Gay,* 2009 WL 596114, at *6 ("While Plaintiff disagreed with Defendant's decision not to place him on suicide watch ..., that does not give rise to civil rights claim for violation of his Eighth Amendment right.") (citing *Garvin v. Armstrong,* 236 F.3d 896, 897 (7th Cir.2001)); *see also* Gay, 2009 WL 596114, at *14 ("Simply put, an inmate does not have a constitutionally protected right to be placed on crisis watch at any time he chooses.").

**\*12** Moreover, on the facts before the Court, McEachin has not proven negligence on Trapasso's part, much less deliberate indifference to a serious medical need. Trapasso carefully evaluated McEachin prior to his admission in SHU, and she and the medical staff monitored him throughout his stay there. The observation notes are consistent in assessing McEachin's suicide risk as low. Trapasso saw no acute issues, concerns or changes during her own observations of McEachin, but instead noted that his behavior and demeanor was consistent with his diagnosed antisocial personality disorder.

Considering the totality of McEaching's treatment by Trapasso and the timing of his alleged threats of self-harm, the Court finds as a matter of law that even if the Trapasso's treatment decision was erroneous, deliberate indifference cannot be inferred because the decision was not "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment," *Estate of Cole,* 94 F.3d at 262; *see also id.* at 263 (prison doctor's diagnosis of pretrial detainee (who asphyxiated himself with a plastic bag) as a "potential suicide risk" rather than as a "high suicide risk" requiring greater precautions was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the doctor did not base her diagnosis on such judgment; thus, doctor was not deliberately indifferent to the decedent's serious medical needs) (citation omitted).

**7. Eighth Amendment Claims Against Edwards Regarding the Restricted Diet**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff contends that Edwards, a Physician's Assistant, violated his Eighth Amendment rights in relation to Plaintiff's restricted diet. According to Plaintiff, Edwards "signed" for him to placed on the restricted diet, "obviously ignoring the fact plaintiff was/has already lost a considerable amount of weight" and failing to examine Plaintiff prior to his being placed on the diet. Plaintiff complains that Edwards failed to examine him while he was on the restricted diet.

Contrary to Plaintiff's contention, the restricted diet was not ordered by Edwards but instead was medically approved by Dr. Laskowski. Bates # 00204, Ex. to Edwards Decl. Furthermore, as discussed above in this Decision and Order, McEachin's complaints that he was losing weight and was sick from eating the loaf were found to be without merit when investigated by prison medical staff. Finally, nowhere in McEachin's complaints to prison officials regarding the restricted diet does he identify Edwards-or any other medical staff-by name. McEachin's complaints against Edwards fail for lack of personal involvement. *See Colon v. Coughlin,* 58 F.3d at 973.

**E. Verbal Harassment**

Plaintiff has accused CO Kingsley of calling him "nigger", of referring to "nooses" and hanging, and calling him "McSnitching" instead of McEachin. Am. Comp., ¶¶ 77 and 79; McEachin Dep. at 45. CO Kingsley has denied making these statement or otherwise acting improperly towards Plaintiff.

**\*13** Prison officials' use of racial epithets or discriminatory comments reflecting racial prejudice do not, without more, violate the Constitution. *Wright v. Santoro,* 714 F.Supp. 665, 667 (S.D.N.Y.) (comments made by prison official including "Get your black ass out of my office" and "I'll lock your black ass up", unaccompanied by physical injury, did not amount to a violation of inmate's Constitutional rights) (citing, *inter alia, Johnson v. Glick,* 481 F.2d 1028, 1033 n. 7 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324

(1973), *rejected on other grounds by Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Black Spotted Horse v. Else,* 767 F.2d 516, 517 (8th Cir.1985) (holding that "discriminatory statements" reflecting racial prejudice not actionable under § 1983 where not shown to be connected with physical injury); *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir.1979) (*per curiam* ) ("Verbal harassment or abuse of the sort alleged in this case is not sufficient to state a constitutional deprivation under 42 U.S.C. s 1983.")), *aff'd mem.,* 891 F.2d 278 (2d Cir.1989). As a matter of law, Plaintiff's allegations regarding the alleged verbal harassment by CO Kingsley do not state an actionable claim under 42 U.S.C. § 1983.

**F. Failure to Respond to Grievances**

With regard to Superintendent Conway and Deputy Superintendent James, Plaintiff's allegations are that they have failed respond to his complaints. *See* McEachin Dep. at 50–51 ("Question: You said you wrote him a lot of letters?" Answer: "Yes;" Question: Is your complaint basically that he hasn't addressed your concerns? Answer: "Yes ... he failed to take corrective action on any of the issues."). Plaintiff's allegation that Superintendent Conway failed to take any action is unsupported by the record, which establishes that Conway did not ignore Plaintiff's grievances. *See* Conway Decl., ¶ 9. Some grievances were accepted and some were denied. *Id.* Moreover, Plaintiff has not alleged sufficient "personal involvement" by Conway and James in the purported constitutional violations. Rather, it appears that Plaintiff is suing Conway and James based solely on their supervisory positions within NYSDOCCS. Mere "linkage in the prison chain of command," *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985), is insufficient to make the required showing of "personal involvement", *see id.* (holding that inmate's claim for monetary damages against State Commissioner of the Department of Correctional Services and superintendent of a correctional facility in civil rights action under 42 U.S.C.A. § 1983 based on fellow inmate's assault required a showing of more than linkage in the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

prison chain of command to acts of correctional officer who allegedly violated inmate's rights, as doctrine of respondeat superior did not apply to make such defendants liable for officer's acts); *accord, e.g., Foreman,* 2004 WL 1886928, at *7. The fact that Superintendent Conway affirmed the denial of Plaintiff's grievances is insufficient to establish personal involvement. *See id.* ("[T]he Superintendent's adoption of the recommendation by the investigating officer cannot by itself demonstrate that he failed to remedy known misconduct. Were it otherwise, virtually every prison inmate who sues for Constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent.").

**V. Conclusion**

**\*14** For the foregoing reasons, Defendants' Motions for Summary Judgment (Dkt.55 & 91) are granted and Plaintiff's Amended Complaint (Dkt.# 34) is dismissed in its entirety with prejudice. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

W.D.N.Y.,2012.
McEachin v. Bek
Not Reported in F.Supp.2d, 2012 WL 1113584 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 🗝 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996. FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See,* Toliver v. County of Sullivan, 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g.,* Forster v. Bigger, 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

*5 Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))



**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney General, The Capitol Albany, NY, for Defendants.

*DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting various violations of his constitutional rights arising out of his placement at the Southport Correctional Facility. In his Complaint, Plaintiff alleges that he was improperly sent to the Special Housing Unit ("SHU") at a maximum security facility and that being in SHU has put his life in jeopardy. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety for failure to exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. Plaintiff signed the instant Complaint on April 7, 2004. On his Complaint form, Plaintiff indicated that there is a grievance procedure available to him and that he availed himself of the grievance procedure by filing a complaint with the IGRC [FN2], followed by an appeal to the superintendent of the facility, and then to the Central Office Review Committee in Albany. The Complaint indicates that Plaintiff is "waiting for response from Albany." The Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant Complaint, Plaintiff filed a grievance relating to the issues presented in this case. On April 19, 2004, the IGRC recommended that Plaintiff's grievance be denied. Plaintiff then appealed that decision to the facility Superintendent. In the meantime, on April 27, Plaintiff commenced the instant litigation. On May 3, 2004, after Plaintiff filed the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.